# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# VICTORIA DIVISION

| | | |
|---|---|---|
| RAYFORD L. KELLER, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. V-02-62 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Pending before the Court is Defendant's Motion for Partial Summary Judgment (Dkt. #25). The Court, having considered the motion, the response, and the applicable law, is of the opinion that the motion should be DENIED.

### Factual and Procedural Background

Plaintiffs seek the recovery of $40,455,332 in estate taxes paid with respect to the estate of Maude O'Connor Williams ("Decedent"), who died on May 15, 2000. Plaintiffs, Rayford L. Keller, Ann Harithas, and Steven Craig Anderson (collectively "Plaintiffs"), as executors of Decedent's estate, base their claim for refund primarily upon a discounting of the value of limited partnership interests allegedly owned by two trusts, which were included in Decedent's estate for estate tax purposes. Although the events surrounding the formation of the alleged limited partnership involve numerous complex financial transactions that occurred over the span of several years, the Court will highlight the relevant underlying facts and circumstances below.

**I.     The Family Trust Agreement**

On June 26, 1998, Decedent and her husband, Roger P. Williams, executed a trust agreement

establishing the Family Trust.[1] Decedent was designated as the initial trustee of the trust or trusts to be created by the agreement. Under the terms of the agreement creating the Family Trust, upon the death of either Decedent of her husband, the trust was to be divided into two parts: Share A, which was to be composed of the survivor's interest in the community property and his or her separate property, and Share M, which was to be all remaining property, i.e., the deceased spouse's interest in the community property and his or her separate property.[2] The trust provided for the postponement of the division of the assets into two parts "for a period reasonably required for the administration of the Deceased Settlor's estate."[3] Once divided, Share A was to be "distributed" to Trust A and Share M was to be "distributed" to Trust M. The survivor had the right not to fund, in whole or in part, Trust A, and further could disclaim all or any part of his or her interest in Trust M, in which case a Disclaimer Trust would be created and then funded by the disclaimed interest.[4]

Once the Family Trust was divided and distributed into the two respective trusts, the trustee could distribute all of the income of Trust A to the survivor.[5] The trust could also distribute to the survivor so much of the principal of Trust A as was directed by the survivor in writing and so much of the principal as was needed to provide for the health, maintenance, and support of the survivor at his or her accustomed standard of living, or for such other purpose as was in the best interest of

---

[1] The trust or trusts established under the agreement were to be collectively known as the RPW/MOW Family Trusts. Dkt. #26, App. A, Ex. 2, ¶ 1.5.

[2] *Id*. at ¶ 3.2.

[3] *Id*. at ¶ 3.2(C).

[4] *Id*. at ¶ 3.5(C).

[5] *Id*. at ¶ 3.4(A).

the survivor.[6] The survivor also has a general testamentary power of appointment with respect to the assets of Trust A remaining at his or her death.[7] As for Trust M, the trustee was required to distribute all of the income to the survivor.[8] The trustee could also distribute to the survivor so much of the principal of Trust M as was needed to provide for the health, maintenance, and support of the survivor, taking into account all other resources available to the survivor. The survivor also had a special testamentary power of appointment with respect to the assets of Trust M remaining at his or her death.[9] Upon the death of the survivor, Trust A, Trust M, and the Disclaimer Trust were to terminate.[10] The assets in these trusts were then to be distributed into six different trusts with each trust receiving a certain percentage of the remaining assets.[11]

On June 24, 1998, Decedent, as trustee, opened checking accounts at First Victoria National Bank for the RPW/MOW Family Trust and for the RPW/MOW Family Trust MOW/SPA ("Family Trust SPA").[12] The two different accounts were apparently intended to serve as a tracking mechanism to identify the character of the property, i.e., community or separate, transferred to the Family Trust. On June 26, 1998, Decedent, as trustee, opened a Vanguard Brokerage Services

---

[6] *Id.* at ¶ 3.4(B).

[7] *Id.* at ¶ 3.5(C)(1).

[8] *Id.* at ¶ 3.5(A).

[9] *Id.* at ¶ 3.5(G)(2).

[10] *Id.* at ¶¶ 3.4(C), 3.5(G), & 3.6(C).

[11] *Id.* at ¶ 4.1.

[12] Dkt. #26, App. A, Ex. 1.

("VBS") account and two Vanguard money market accounts for the Family Trust.[13] Thereafter, Decedent and her husband transferred their interests in their personal Vanguard accounts to the corresponding Family Trust Vanguard accounts.[14] The value of the assets transferred to the Family Trust Vanguard accounts was approximately $194,000,000.[15] The same day, Decedent, as trustee, opened a VBS account and a Vanguard money market account for the Family Trust SPA, and she transferred her personal Vanguard accounts, valued at approximately $25,000,000, to the corresponding Family Trust SPA Vanguard accounts.[16] Additional securities valued at approximately $84,842,500 were transferred by Decedent and her husband from their brokerage account at First Victoria National Bank to the Family Trust VBS account in July 1998.[17] During that same period Decedent also transferred approximately $6,965,000 in additional securities from her brokerage account at First Victoria National Bank to the Family Trust SPA VBS account.[18]

## II.  Decedent's Husband's Estate

On January 5, 1999, Decedent's husband died at the age of 89.[19] Decedent was executor of his estate, and in that capacity, on September 28, 1999 executed a disclaimer that disclaimed so much of the property passing into Trust M as would cause the taxable estate plus gifts to equal

---

[13] *Id*. at Ex. 3.

[14] *Id*.

[15] *Id*. at Ex. 4.

[16] *Id*. at Ex. 5 & 6.

[17] *Id*. at Ex. 7.

[18] *Id*. at Ex. 8.

[19] *Id*. at Ex. 9

4

$3,000,000.[20] This disclaimed amount was $1,966,213.[21] On April 5, 2000, the estate of Decedent's husband filed an United States Estate Tax Return that reflected a net estate tax liability of $621,115.[22] Of the total $167,487,817 gross estate, $162,115,364 was comprised of the assets previously transferred by the Decedent and her husband to the Family Trust. The residuary estate was included on Schedule M of the return for purposes of qualifying for the marital deduction, which offset $165,045,979 of the gross estate.[23]

## III. The Management Company

On May 9, 2000, Santo Bisignano, Jr., Esq, as incorporator, executed the Articles of Incorporation of MOW/RPW Management Company, Inc. ("Management Company").[24] The articles provided that the "[c]orporation [would] not commence business until it had received for issuance of its shares consideration of the value of $1,000.00."[25] On that same day, a Unanimous Consent of Directors in Lieu of Organizational Meeting of the Management Company was executed by Decedent, Ms. Harithas, and Michael Anderson. This Consent adopted the bylaws, established that until Decedent's death the number of directors would be three and that after her death the number of directors would be even, half of which would consist of Ms. Harithas or her descendants and the other half consisting of the descendants of Mary Alice Fitzpatrick. The Consent further

---

[20] *Id.* at Ex. 11.

[21] *Id.* at Ex. 10, Sch. M.

[22] *Id*. at Ex. 10.

[23] *Id*.

[24] *Id*. at Ex. 12, art. Fifteen.

[25] *Id*. at art. Twelve.

elected Decedent as president and treasurer, Michael Anderson as vice president and secretary, Ms. Harithas as vice president, and also authorized the issuance of 100,000 shares, par value $.01, to Decedent upon receipt of $1,000.[26] The bylaws were certified by Michael Anderson on the same day, and the Articles of Incorporation were filed on May 11, 2000.[27]

## IV.   The Limited Partnership

On May 9, 2000, Decedent, in her capacity as president of the Management Company, as trustee of Trust A, and as trustee of Trust M, executed an Agreement of Limited Partnership of MOW/RPW, Ltd. ("Limited").[28] The stated purpose of the partnership is to provide a means for the Family to manage Family Assets.[29] The Management Company was the initial general partner, with a .1% percentage interest, while Trusts A and M were the initial limited partners, with a 49.95% percentage interest each.[30] The initial capital contributions to the partnership required by the agreement were not specified in the agreement. On May 11, 2000, the Certificate of Limited Partnership was filed with the Secretary of State.[31]

## V.   Decedent's Estate

At 12:35 a.m. on May 15, 2000, Decedent died.[32] On February 12, 2001, a check in the

---

[26] *Id*. at Ex. 13.

[27] *Id*. at Ex. 14 & 16.

[28] *Id*. at Ex. 21.

[29] *Id*. at ¶ 5.1.

[30] *Id.* at Sch. A.

[31] *Id*. at Ex. 22.

[32] *Id*. at Ex. 27.

6

amount of $147,800,245 was drawn on a Family Trust Vanguard money market account and made payable to the United States Treasury with respect to Decedent's estate.[33] On or about August 15, 2001, the Estate filed a Form 706, United States Estate Tax Return.[34] The return was prepared and signed by the Executors, Michael Anderson, Ms. Harithas, and Rayford Keller. Of the total $383,669,668 gross estate, $368,766,230 was attributable to Trust A and Trust M. Of the $368,766,230 value of the trust, $260,781,622 was attributable to the trusts' interest in Limited.[35] The estate tax liability was $143,450,169. On or about November 15, 2001, the Estate filed a Form 843, Claim for a Refund and Request for Abatement, amending the Original 706. The Claim for Refund requests a refund of $40,455,332.00, or such other amount as is legally and/or equitably refundable, together with interest thereon.

When the Commissioner did not act upon the refund request within six months, the Estate filed its Complaint in this Court on July 5, 2002 seeking the refund.[36] Defendant filed its Motion for Partial Summary Judgment on December 15, 2003, to which Plaintiffs responded on January 30, 2004. The Court denied the motion as moot on September 6, 2004, but allowed Defendant to re-urge the motion at an appropriate time.[37] Defendant re-urged its motion on October 15, 2004.

**Summary Judgment Standard**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and

---

[33] *Id.* at Ex. 28.

[34] *Id.* at Ex. 29.

[35] *Id.*

[36] Dkt. #1.

[37] Dkt. ##34 & 35.

7

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then they are not entitled to a summary judgment and no defense to the motion is required. *Id*.

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the

non-movant. *See In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001); *see also Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Willis v. Moore Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

**Discussion**

In its motion, Defendant offers several arguments in support of its position that partial summary judgment is appropriate. First, Defendant asserts that the two trusts, Trust A and Trust M, which entered into the Agreement of Limited Partnership on May 9, 2000 did not exist for want of a corpus. Second, Defendant argues that the Management Company was not authorized to conduct business. These two assertions, according to Defendant, mean that Limited never came into existence because it neither had limited partners nor a general partner, and, as such, the trusts' assets were properly included in Decedent's estate. Third, Defendant argues that, even if Limited was formed, there were no assets in the partnership at the time of Decedent's death. Finally, and in the alternative, Defendant maintains that the partnerships assets were properly included in Decedent's estate under Sections 2036(a) and 2038(a) of the Internal Revenue Code.

**I.    The Limited Partnership**

As Defendant notes, the actual existence of Limited is central to any claim that estate tax

liability should be reduced based upon a discounting of the value of limited partnership interests allegedly owned by the estate. As discussed above, Defendant attacks the existence of Limited, in effect, by attacking its component parts. That is, Defendant disputes that the purported limited partners existed, and further that the general partner had the authority to enter into any partnership agreement. In the alternative, Defendant contends that there are no assets in Limited because the alleged partners never actually made their respective capital contributions. Nor is there, according to Defendant, any competent evidence as to what those initial capital contributions were supposed to be. As such, Defendant maintains that Plaintiff's claim fails. The Court will address each of these issues below.

### A. Existence of the Trusts

The first issue before the Court is whether Trust A and Trust M came into existence such that they could properly be considered limited partners in the partnership. According to Defendant, these trusts were never funded before Decedent's death, and consequently, failed for lack of a corpus. As a result, under Defendant's view, Decedent could not have entered a limited partnership on their behalf as trustee, and therefore, no discount should apply. In response, Plaintiffs assert that the beneficial interests of Trust A and Trust M in the assets of the Family Trust vested upon Decedent's husband's death, and that neither legal title to trust assets nor segregation of trust assets is required for the recognition of a trust's existence. The Court agrees that legal title and segregation are unnecessary, and concludes that summary judgment is not appropriate as to this issue.

Defendant's position primarily rests upon two aspects of the agreement establishing the Family Trust. First, Defendant notes that Decedent had the option under the terms of the Family Trust to defer division and distribution of the trust assets into Trust A and Trust M for a period reasonably required for the administration of her husband's estate. According to Defendant, "[t]his

she elected to do," and "[w]hile Decedent allegedly intended to divide such property into Part A and Part M and then to fund Trust A and Trust M in May 2000, in conjunction with the funding of Limited, this was not accomplished prior to her death."[38] Second, Defendant points to the facts that Decedent had the right not to fund Trust A, and also that the funding of Trust M depended on how much was disclaimed. As such, the existence of such trusts was contingent upon certain actions by Decedent that were not taken.

The Court first notes that the language of the Family Trust relating to the funding of Trust A and Trust M provides that on the death of either Settlor, "the Trustees shall divide the trust estate . . . into two (2) shares, Share A and Share M" and then "shall distribute Share A to Trust A" and "Share M to Trust M." Thus, the division and distribution of the trust assets by the trustee of the Family Trust was required, even if deferral of such action was also provided for under the terms of the Family Trust to account for the administration of deceased Settlor's estate. Because Decedent was bound as trustee to complete this action, the Court finds that Trust A and Trust M had, at the very least, an equitable interest in the Family Trust assets that would constitute a sufficient corpus to prevent their failing. That is, the fact that the Family Trust might have continued to hold legal title to the trust assets in not dispositive. Moreover, the Court must assume for the purposes of summary judgment that it was Decedent's intent to fund Trust A, despite Defendant's argument that she might have chosen not to do so.

Additionally, the Court has not uncovered, nor has Defendant directed the Court, to any case standing for the proposition that trust assets are required to be segregated in order to avoid failure for lack of a corpus. Regardless of the actual necessity of segregation, the trust document in this case provides for the trustee "to make joint investments of the assets of the several trusts and to hold

---

[38] Dkt. #26, p. 18 (citations omitted).

11

those assets in undivided interests or as a common fund, and to account separately among the several trusts in proportion to their interest therein." Although the Family Trust assets were generally held in common accounts, there is evidence that the income from these assets was accounted for separately. Furthermore, the evidence also indicates that the couple's community and separate property was tracked, which would have provided some indication as to the relative segregation of the Trust A and Trust M. Under these circumstances, the Court is unable to conclude that summary judgment is warranted as to this issue.

### B. Management Company's Authorization to Conduct Business

The second issue raised by Defendant involves whether the Management Company was authorized to conduct business prior to Decedent's death because it had not received $1,000 in value for issuance of its shares. Defendant argues that, without the ability to conduct business, the Management Company could not participate in the formation of Limited. Plaintiffs respond first by noting that under Texas law the Management Company existed as a valid corporation because a certificate of incorporation had been issued. Plaintiffs also contend that the failure to contribute $1,000 does not affect the authority of the corporation to operate. Rather, Plaintiffs suggest that the effect of such a failure makes the Directors of the corporation personally liable for the debts of the corporation up to the unpaid amount. Finally, Plaintiffs argue in the alternative that there is a fact issue as to whether the Management Company actually received $1,000 worth of "labor done."

In general, the Court concurs with Plaintiffs that the failure of Decedent to contribute $1,000 for the issuance of its stock is not fatal to its claim. First, as Plaintiffs note, the former statutory requirement for a corporation to receive $1,000 consideration for the issuance of its shares was intended to shield creditors against "watered stock." *See, e.g.*, *H. J. Cohn Furniture (No. 2) Co. v. Texas Western Financial Corp.*, 544 F.2d 886, 889 (5th Cir. 1977) (explaining protective capacity

12

of similar provision in Texas Constitution). The Court further notes that the statutory requirement of the $1,000 contribution in no longer in effect. *See* H.B. No. 1165, Regular Session 78th Legislature (Sections 18 and 20 of the bill delete Article 2.41(A)(2) and Article 3.02(A)(7) respectively of the Texas Business Corporations Act, effective September 1, 2003). Although this provision was in effect at the time of this case and therefore applies to these facts, as does the same requirement in Management Company's corporate charter, the Court recognizes that the former statute also specifies the effect of failing to comply. In particular, the statue indicates that the directors of a corporation that commences business before receipt of the $1,000 "shall be jointly and severally liable to the corporation for such part of the required consideration as shall not have been received before commencing business . . . ." Indeed, the statutory remedy for non-compliance further supports the notion that the intent of the statute is protective in nature. Nothing in this former statute, however, and no legal precedent that this Court has found indicates that the effect of non-compliance would be to void acts already taken by an existing corporation before the consideration is paid. As a result, summary judgment is not warranted on this point.

### C. Assets of the Limited Partnership

Defendant's last challenge to Limited is that there were no assets placed into Limited prior to Decedent's death. Nor was there, according to Defendant, any legally binding agreement to transfer any assets to Limited. In support of its position, Defendant notes that it is uncontested that Limited was not actually funded prior to Decedent's death, but, rather, was funded in August 2001, over a year later. Furthermore, although paragraph 8.1 of the Agreement of Limited Partnership provided that "[e]ach Partner shall contribute to the Partnership, as his initial Capital Contribution, the property described in Schedule A attached as part of this Agreement,"[39] Defendant notes that

---

[39] Dkt. #26, App. A, Ex. 21, at 24.

13

Schedule A was not filled in prior to Decedent's death. The Schedule A attached to the agreement defined each partner's percentage interest, but left the "Initial Capital Contribution" for each partner blank, except for a dollar sign. Defendant contends that there was no writing signed or initialed by Decedent indicating her intent as to what the initial contributions to the partnership were to be. In fact, the document was apparently not revised until January 2002 to add an amount for the required initial contributions.

Defendant also submits that the only "evidence" regarding the amount of capital contributions to be made to Limited are alleged oral statements by Decedent to her accountants, which Defendant argues are barred by Rule 601(b) of the Texas Rules of Evidence, also known as the "Dead Man's Rule." Defendant also asserts that any such statements would constitute inadmissible hearsay. In response, Plaintiff first challenges the applicability of Rule 601(b) and suggests that the Federal Rules of Evidence should govern the testimony of the relevant witnesses. Second, Plaintiff also argues that the hearsay rule would not bar the testimony, either because the alleged hearsay would constitute a verbal act or because an exception to the hearsay rule would apply. The discussion between the parties regarding this issue underscores the inappropriateness of summary judgment on this issue. As Defendant noted in its response to a motion to exclude by Plaintiff, "a request for an advanced ruling on the admissibility of evidence, is, in essence, a motion in limine,"[40] which the Court agrees would be premature at this stage in the context of a bench trial. Because the foregoing issue concerning whether and to what extent Decedent intended to make her initial contributions to the partnership is inherently a factual inquiry, the Court will reserve such a determination until the time of trial. At that time, the Court will be better positioned to evaluate the

---

[40] Dkt. #29, p. 2 (citing KENNETH S. BROWN et al., 1 MCCORMICK ON EVIDENCE 202 (John William Strong ed.) (4th ed. 1992).

admissibility of evidence, as well as to make factual findings regarding Decedent's intent.

## II. Sections 2036 and 2038 of the Internal Revenue Code

Defendant argues in the alternative that Decedent retained a life interest in the property transferred to Limited, and/or the power to revoke any transfer of property to Limited, such that the transferred property was properly includable in Decedent's estate. Specifically, Defendant contends that Decedent's alleged transfer of the trust assets at issue falls within the ambit of Sections 2036 and 2038 of the Internal Revenue Code, which both operate to recapture the value of property transferred from the estate for estate taxation purposes when the conditions described above are present. In response, Plaintiffs argue first that neither provision applies because the transaction at issue constitutes a bona fide sale for an adequate and full consideration in money or money's worth. Even if this exception does not apply, however, Plaintiffs contend that Decedent did not retain possession or enjoyment of the transferred property, or any power to revoke the transfer of property.

As noted above, Section 2036(a) and Section 2038(a) are provisions of the Internal Revenue Code intended to prevent parties from avoiding the estate tax by means of testamentary substitutes that permit a transferor to retain lifetime enjoyment of purportedly transferred property, or, in the case of Section 2038(a), that permit a transferor to alter, amend, revoke, or terminate the power to control the transferred interest. Specifically, Section 2036(a) provides that property transferred by a decedent will be included in the taxable estate if, after the transfer, the decedent retains either (1) "possession or enjoyment" of the transferred property; or (2) "the right ... to designate the persons who shall possess or enjoy the property or the income therefrom." A transferor retains "possession or enjoyment" of property, within the meaning of § 2036(a)(1), if he retains a "substantial present economic benefit" from the property, as opposed to "a speculative contingent benefit which may or may not be realized." *United States v. Byrum*, 408 U.S. 125, 145, 150 (1972).

Section 2038(a) provides in part:

The value of the gross estate shall include the value of all property --

. . . [t]o the extent of any interest therein of which the decedent has at any time made a transfer . . . where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power . . . to alter, amend, revoke, or terminate, or where any such power is relinquished during the 3-year period ending on the date of the decedent's death.

With both Section 2036 and Section 2038, however, the Code provides an exception for any transfer of property that is a "bona fide sale for an adequate and full consideration in money or money's worth." The exception contains two discrete requirements: (1) a "bona fide sale," and (2) "adequate and full consideration." *See Strangi v. Commissioner*, 417 F.3d 468, 478 (5th Cir. 2005) (citing *Estate of Harper v. Commissioner*, 2002 WL 992347, T.C. Memo 2002-121 (2002). The United States Court of Appeals has addressed this exception in two recent cases and provided guidance as to its application. *See Strangi*, 417 F.3d at 478-82; *Kimbell v. United States*, 371 F.3d 257 (5th Cir. 2004).

In *Kimbell*, the decedent transferred significant assets in cash, an active oil and gas business, and royalties to a trust. *Kimbell*, 371 F.3d at 259. The trust contributed the property to a limited partnership and in return received a 99% partnership interest as a limited partner. *Id*. The other partner was a limited liability company (the LLC) owned by the decedent, her son, and his wife, which contributed $25,500 in exchange for a 1% general partnership interest. *Id*. The oil and gas working assets constituted 11% of the partnership's assets, and the decedent retained over $450,000 in assets for her personal expenses. *Id*. The district court concluded in the summary judgment context that the exception did not apply. In particular, the district court concluded that "[b]ecause Mrs. Kimbell, or at least family members, were present on both sides of the transfer to the Partnership, . . . that the transfer was not at arm's length and therefore not a 'bona fide sale.'" *Id*.

16

at 262. The district court also found that the pro rata interest in the limited partnership that Mrs. Kimbell received was not adequate consideration for the assets she transferred, but instead, a paper transaction resulting in a mere "recycling of value." *Id*.

In reversing, Fifth Circuit disagreed with the lower court's determination that a sale between family members cannot be a bona fide one. *Id*. at 267. A transaction between family members is, however, subjected to heightened scrutiny to ensure that it is not a sham or disguised gift. *Id*. at 265. The court went on to hold that the decedent's transfer met the bona fide sale exception because the partnership was in actual possession of the assets transferred, partnership formalities were satisfied, she retained sufficient assets outside of the partnership to meet her personal needs, some of the assets contributed were active business assets, and she had non-tax business reasons for creating the partnership. *Id*. The non-tax business reasons included, among others, the protection of the taxpayer from personal liability with regard to the oil and gas properties contributed, the pooling of all of the decedent's assets to provide greater financial growth than splitting the assets up, and the establishment of a centralized management structure. Additionally, the court found that the pro rata partnership interest the decedent received was adequate and full consideration. *Id*. at 266.

In contrast to *Kimbell*, the Fifth Circuit in *Strangi*, concluded under similar facts that the exception did not apply, and further that the taxpayer had, through an informal agreement with his offspring, retained enjoyment of the property that he nominally transferred to the limited partnership. *Strangi*, 417 F.3d at 477-82. The court ruled that the 'bona fide sale' inquiry turned on whether the challenged transfer was objectively likely to serve a "substantial non-tax purpose." *Id*. at 479-80.. The court noted that the lower court had held that the limited partnership was not, in fact, likely to serve such a purpose, and this factual finding was affirmed as being not clearly erroneous. *Id*. at 491-82. Although *Kimbell* had seemed to indicate that there was no minimum investment by a partner

needed to establish the legitimacy of the stated non-tax purposes for forming a limited partnership, the court in *Strangi* stated that "the existence of minimal minority contributions may well be insufficient to overcome an inference by the finder of fact that joint investment was objectively unlikely." *Id*. at 281. The *Strangi* court also affirmed the finding that "active management" of "working assets" was "objectively unlikely" at the time of the partnerships creation. The majority of the partnership assets were brokerage accounts, the Fifth Circuit noted, and although the partnership contained some real property and interests in real estate partnerships "that might have been actively managed under [the partnership], the Tax Court concluded, based on substantial evidence, that no such management ever took place." *Kimbell* was distinguished as a case within the summary judgment context, in which the government had conceded that there had in fact been "significant active management of the transferred oil and gas properties." *Id*. (citing *Kimbell*, 371 F.3d at 267-68).

Taken together, *Kimbell* and *Strangi* signify to this Court that summary judgment would be inappropriate in this case. Although the Court recognizes that Plaintiffs face a heavy burden in ultimately establishing the applicability of the exception or that neither Section 2036 nor Section 2038 otherwise apply, the Fifth Circuit has clearly indicated that these issues turn on a detailed and thorough analysis of the facts of each case. As such, and considering the significant amount of refund at issue on this lawsuit, the Court finds that the prudent decision at this time is to allow this case to proceed to a trial on the merits, at which time the Court will be better positioned to evaluate all of the evidence in light of the recent Fifth Circuit guidance.

**Conclusion**

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment is DENIED.

It is so ORDERED.

Signed this 30th day of September, 2005.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE