# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| **RAYFORD L. KELLER, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. V-02-62** |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Defendant.** | § | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

This is a suit for the recovery of estate taxes paid with respect to the estate of Maude O'Connor Williams ("Mrs. Williams"), who died on May 15, 2000.  Plaintiffs, the co-independent executors of her estate, base their claim for refund primarily upon a discounting of the value of interests in a limited partnership owned by two trusts.  These two trusts were included in the Decedent's estate for estate tax purposes.  The formation of the limited partnership is at the center of this controversy.

The Court presided over a four-day non-jury trial that ended on February 12, 2007.  After carefully considering the pleadings, the evidence, the pre- and post-trial briefing of the parties, the responses thereto, the entire record, and the applicable law, the Court hereby makes the following findings of fact and conclusions of law.  To the extent that any conclusion of law is more properly characterized as a finding of fact, and/or vice versa, the Court hereby adopts it as such.

**Findings of Fact[1]**

1.    On June 26, 1998, Mrs. Williams and her husband, Roger P. Williams ("Mr. Williams"),

executed a revocable trust agreement that provided for the formation of a family trust, which

would hold a pool of approximately $300 million in cash, certificates of deposit, and bonds

(the "Family Trust").   These liquid and nearly-liquid assets were comprised of  Mrs.

Williams' separate property, Mr. Williams' separate property, and the Williamses'

community property.  Both spouses were 88 years old at the time the family trust agreement

was executed.

2.    The family trust agreement did not provide for or attempt to dispose of the Williamses'

considerable land and mineral holdings, all of which were dealt with separately.

3.    Under the terms of the trust agreement, the Family Trust was to terminate upon the death of

either spouse and devolve into two parts, known as Share M and Share A.  Share M would

include the first-to-die spouse's separate property and one-half of the community property.

Share A would hold the balance of the trust assets, essentially comprised of the surviving

spouse's separate property and one-half of the community property.

4.    Upon termination of the Family Trust, Share M would fund a trust known as Trust M, and

Share A would fund a trust known as Trust A.  The surviving spouse was to serve as the

trustee of both Trust M and Trust A.  The surviving spouse had the right not to fund, in

whole or in part, Trust A, and further could disclaim all or any part of his or her interest in

Trust M, in which case a disclaimer trust would be created and then funded by the

---

[1] The Government has filed several strenuous objections to certain portions of the evidence and testimony proffered in this case. The Court has overruled substantially all of these objections as set forth below in the Court's discussion concerning its conclusions of law. To the extent the Court has not explicitly addressed one or more of the Government's objections, the objection(s) are overruled.

disclaimed interest. The trust agreement also provided that Trust M and Trust A would further devolve upon the death of the surviving spouse into six follow-on trusts for the benefit of the Williamses' grandchildren.

5.      Mr. Williams passed away on January 5, 1999.

6.      Upon his death, pursuant to the terms of the family trust agreement, the Family Trust terminated and its assets were split into Share M, which included Mr. Williams' separate property and half of the community property, and Share A, which included the balance of the trust assets, including Mrs. Williams' separate property and the other half of the community property. In turn, Share M funded Trust M, Share A funded Trust A, and Mrs. Williams, as the surviving spouse, became the trustee of both, which positions she held for the remainder of her life.

7.      After Mr. Williams passed away, Mrs. Williams began a series of discussions with her advisors regarding various options for the protection and disposition of some of the assets held in Trust A and Trust M after her death.

8.      The group of advisors who participated in these discussions included her longtime accountants, Rayford L. "Bo" Keller and his son, Lane Keller, and Mrs. Williams' grandson, Michael Anderson.  Rayford Keller, as one of the co-independent executors of Mrs. Williams' estate, is one of the Plaintiffs in this lawsuit.

9.      Rayford Keller first met the Williamses in the mid-1950s when he moved to Victoria to start his accounting practice after working for the Internal Revenue Service in Corpus Christi as an examining agent.  His first job in Victoria was with an accounting firm that kept offices in the First Victoria National Bank Building, where the Williamses also kept offices from

which they ran the family's various businesses, including their ranching operations and investment portfolios.

10. At some point thereafter, the Williamses asked Rayford Keller to review some of the family's tax returns, an assignment that spawned a close relationship between the Williamses and Rayford Keller that lasted through the end of Mr. and Mrs. Williams' lives. The relationship continues to this day, some five decades later, between the Williamses' children and grandchildren, including Michael Anderson, and Rayford Keller and his son, Lane Keller, who joined his father in the service of the Williamses in the late 1980s and 1990s.

11. Some time following that initial assignment, Mrs. Williams asked Rayford Keller if he would staff the Williamses' offices in Victoria and perform substantially all of the family's tax, accounting, and financial work. Rayford Keller agreed to do so and thereafter entered into an arrangement with the Williamses whereby he billed them a monthly rate and hired a staff to work directly for him from the Williamses' family offices at the First Victoria National Bank Building.

12. Rayford Keller performed some work for other clients during this time period aside from his work for the Williamses; however, his work for the family comprised approximately 75 percent of his practice. His work on their behalf, over the years, ranged from advising the family on financial issues related to the ranching operations, of which Mr. Williams was primarily responsible, to a myriad of other issues, including difficult tax questions, family divorces, and non-ranch investment matters, of which Mrs. Williams was primarily responsible. Moreover, he and Mr. Williams served together for nearly thirty years on the Board of First Victoria National Bank. The clear picture of Rayford Keller that emerged at

trial was that of a man who was singularly dedicated to faithfully acquitting himself of his obligations to the Williamses, in return for which the Williamses trusted him implicitly.

13.    Rayford Keller's testimony regarding his work for the Williamses also paints a credible portrait of Mrs. Williams as an impeccably shrewd businesswoman and frugal heiress—with annual living expenses of about $60,000—who was herself singularly dedicated to safeguarding the family's fortune for the benefit of her would-be heirs.  Before taking ill in her later years, she clearly spent a great deal of time in the family's offices in Victoria, where it would appear that very few, if any, of the details of the complicated and ever-shifting posture of her fortune escaped her.

14.    Of particular concern to Mrs. Williams as she worked to protect the family's interests was the risk of losing control of significant family assets through divorces.  She had been deeply troubled, for instance, by the divorce of her daughter, Ann Harithas—one of the Plaintiffs here—which was impliedly quite lengthy and expensive.

15.    The Harithas divorce strengthened Mrs. Williams' resolve to prevent family assets from falling into the hands of former spouses and other non-blood relatives through divorce or any other means.  This was principally accomplished through the use of various trust arrangements and also by rigorously tracking family members' separate and community property for the purpose of characterizing them under Texas' community property regime.

16.    These efforts apparently paid off during other divorces, including that of another daughter. Unlike Harithas' divorce, the family was able to avoid ceding significant assets because of Rayford Keller's and, later, Lane Keller's efforts at Mrs. Williams' behest to carefully characterize separate and community property.

5

17.     Rayford Keller continued in this position as the Williamses' primary outside advisor until approximately the late 1980s or the early 1990s, when he and the Williamses and his son, Lane Keller, entered into an arrangement whereby Lane Keller, who by this time was also a trained accountant as well as a former banker, would begin to replace his father and take over primary responsibility for handling the Williamses' finances.

18.     Lane Keller started to work for his father in 1989 out of the offices that Rayford Keller ran for the Williamses. By that time, Rayford Keller's work for the Williamses consumed nearly all of his professional time.   Lane Keller worked side-by-side with his father on the Williamses' accounts until early 1993, at which time he took over his father's firm and renamed it Keller & Associates.  Through the day of trial, that firm was still operating in the same offices at the First Victoria Bank Building in Victoria that Rayford Keller agreed to take over and staff for Mrs. Williams many years before.

19.     In fact, according to Lane Keller, there are two name-plaques outside his office: one that says "Keller & Associates" and one that says "Martin O'Connor Cattle Company," which is an umbrella entity that encompasses "the O'Connor Williams family, all of its individuals and their various and sundry trusts and entities."   Dkt. No. 75-6 at 169.   Moreover, Lane Keller serves as an officer of the Martin O'Connor Cattle Company and is a named trustee on numerous family trusts and a named executor in numerous family members' wills.

20.     The extent to which the Kellers and their careers as accountants and advisors share an identity of interests with the Williamses was best stated by Lane Keller, when asked to describe the services that he provides for the family: "We provide all types of accounting services.  We do all of their accounting, all of their tax work, all of their tax planning.  We

handle all of their investment portfolio management.  We pay all of their bills, we pay all the

bills of all the entities.  We provide a lot of personal service to the clients.  Almost anything

that they might want to have done by what would typically be a family office, we would

provide that service as well."  Dkt. No. 75-6 at 170-71.

21.    When asked to elaborate on what he meant by "almost anything that they might want to have

done," Lane Keller testified as follows: "[a member of the family] might need a credit card,

we might wind up making arrangements for them to have an application done, get the credit

card.  We might help them with the purchase of automobiles or the purchase of real estate

... any business[-]type transaction that might come along, we would be happy to be involved

with it."  Dkt. No. 75-6 at 171.  He also testified that his firm produces approximately 125

tax returns for members of the Williams family and related entities.

22.    At the time of the transaction underlying this dispute, Lane Keller had been the Williamses'

primary outside advisor for nearly a decade.

23.    It is important to note, however, that Rayford Keller remained intimately involved with the

family's dealings even after passing most of the day-to-day workload to his son.  And though

he is now mostly retired, he continues to maintain an office at Keller & Associates/Martin

O'Connor Cattle Company.

24.    The discussions that occurred after Mr. Williams' death in 1999 centered around the

possibility of forming a series of family limited partnerships for the purpose of holding some

or all of the family's real estate, mineral interests, and the investment assets held by the

family trust—one limited partnership for each class of asset.

25.    It is clear to the Court that the primary purpose of these partnerships was to consolidate and

7

protect family assets for management purposes and to make it easier for these assets to pass from generation to generation.  Any estate tax savings that resulted from these partnerships were, in the Court's view, merely incidental. It is, therefore, clear to the Court that the primary purpose of these partnerships was not federal estate tax avoidance, and the actions taken to form these partnerships were not done so to create a disguise gift or sham transaction as those terms are used in estate taxation.

26.    Based on his participation in these discussions regarding the potential limited partnerships, Rayford Keller testified that his understanding was that the investment partnership ("Partnership" or "Investment Partnership") was to own the community property bonds that formed part of the corpus of the Williamses' Family Trust ("Community Property Bonds" or "Bonds").  At that time, the beneficial ownership in the Community Property Bonds was in the name of the Family Trust in an account maintained by the Vanguard Group, an investment management company. *See* Defs.' Exs. 5-8.

27.    As Rayford Keller testified, "[w]hat was going to be put into [the Investment Partnership] were the [C]ommunity [P]roperty [B]onds."  Dkt. No. 75-3 at 62.  Lane Keller corroborated his father's recollection that the assets Mrs. Williams considered transferring to the Investment Partnership were to primarily consist of the Community Property Bonds.

28.    Rayford Keller's further understanding was that the Investment Partnership, if formed, was to be comprised of two limited partners and one general partner.  The two limited partners of the Investment Partnership were to be the two trusts, Trust M and Trust A, that were funded by the two shares of the family trust, Share M and Share A, that devolved from the Family Trust upon the death of Mr. Williams.  The general partner of the Investment

Partnership was to be a limited liability company that would be formed concurrently with the Partnership. Mrs. Williams would initially own all of the shares in the general partner, but was to transfer and/or sell her shares to other family members who would jointly control the Investment Partnership after her death.

29. The plan as initially conceived, and later commemorated in the Partnership's governing documents, was for Trust A and Trust M each to hold 49.95 percent limited partnership interests, and the general partner to hold a .1 percent general partnership interest.

30. The discussions between Mrs. Williams and her advisors intensified during the summer of 1999, at which time several meetings were held to discuss the Investment Partnership. These meetings typically occurred at Mrs. Williams' home in Victoria, and were attended by Mrs. Williams, Rayford Keller, and Lane Keller. Occasionally, the group met in the offices of the Keller's accounting firm. The meetings that occurred at the firm's offices (also the Williamses' family offices) were also attended by an associate of Lane Keller's, an accountant named Lynn Miori.

31. Mrs. Williams' health was declining during this period, but not failing. She was legally blind, but was credibly described as cogent and able to see well enough to read with some difficulty and to sign her name. She was further credibly described by Rayford Keller and Lane Keller as being sharp enough to discuss the details of her plans for the partnership in detail.

32. In September 1999, after several of these meetings over the summer, Rayford Keller compiled a spreadsheet (Pls.' Ex. 22) at Mrs. Williams' request reflecting "what could go into – would go into the [I]nvestment [P]artnership or could go into it, and those were all the

9

potential [P]artnership assets."  Dkt. No. 75-3 at 76.

33.     The spreadsheet set forth book values for the balances of Mrs. Williams' various accounts as of August 31, 1999.  Of particular interest are the last three columns on the right-hand side of the spreadsheet labeled "Q-Tip," "MOW," and "FUNDING PARTNERSHIP."  Pls.' Ex. 22.  The first two of these, the "Q-Tip" and "MOW" columns, both appear beneath a broader column heading that appears to apply to both of them called "POTENTIAL P[ARTNER]SHIP." *Id.*

34.     Testimony at trial credibly indicated that (1) the "Q-Tip" column represented the assets of Trust M that were available to fund the Investment Partnership and (2) the "MOW" column represented the assets of Trust A that were likewise available.  "Q-Tip" is a common moniker for a type of trust known as a qualified terminable interest property trust; "MOW" are Mrs. Williams' initials.  These columns included the investment assets held by Trust M (the "Q-Tip" column)  and Trust A (the "MOW" column).  According to Rayford Keller, these two columns were "listed as the potential assets that were – that could go into the family investment." *Id.*  The last column, the one titled "FUNDING PARTNERSHIP," apparently represented "what would normally go into the [I]nvestment [P]artnership." *Id.*

35.     Rayford Keller's testimony on these points was corroborated by Lane Keller, who said, referring to the "Q-Tip" and "MOW" columns, "these are assets that are available to be utilized in funding the [P]artnership." Dkt. No. 75-6 at 190.  Lane Keller also stated that the "FUNDING PARTNERSHIP" column "shows all of the [C]ommunity [P]roperty [B]onds being utilized to fund the [P]artnership, and the amount of cash to be utilized to bring the [P]artnership funding up to 250 million dollars." *Id.*

36.    The "Q-Tip" column lists assets from nine accounts totaling approximately $163 million. The MOW column also lists assets from nine accounts—though not all nine are the same as the nine associated with the "Q-Tip" assets—totaling approximately $203 million.    Pls.' Ex. 22.  The subtotals at the bottom of these two columns indicate that approximately $125 million from Trust M and $125 million from Trust A were to become the property of the Investment Partnership for a total of approximately $250 million.  *Id.*

37.    The "FUNDING PARTNERSHIP" column, the column indicating the sources of the $250 million in assets to be held by the Partnership, lists the following: $161 million in community municipal bonds, $79.1 million in community treasury securities, and $9.7 million in cash that was held in a money market account.  Pls.' Ex. 22.  As Rayford Keller testified, the bulk of the assets slated for the Investment Partnership (approximately $240 million) was to be the Community Property Bonds held by Trust M and Trust A.

38.    Rayford Keller testified that the $250 million figure was used because it was "very close to" the value of the Bonds.  Dkt. No. 75-4 at 82.  Indeed, Rayford Keller declared that "250 was not a fixed number.  It was [the Bonds] that were fixed, and they approximate 250 million dollars."  Dkt. No. 75-5 at 146.  Similarly, Lane Keller testified "[Mrs. Williams] was very comfortable with transferring all of her [C]ommunity [P]roperty [B]onds into the [P]artnership,"  Dkt. No. 75-6 at 190, and that his understanding after the September 1999 meeting was that the assets to be placed in the Investment Partnership were "[t]he [C]ommunity [P]roperty [B]onds, pure and simple."  Dkt. No. 75-3 at 83.

39.    Lane Keller further testified that Mrs. Williams intended to place the "[B]onds and enough cash to bring [the amount placed in the Investment Partnership] to 250 million dollars."  Dkt.

No. 75-6 at 193; Pls.' Ex. 62.  Accordingly, approximately $10 million in cash was added. Pls.' Ex. 22.

40.  Exhibit 22 also has a reference to "gift tax."  According to Lane Keller, this reference was based on a previous discussion with Mrs. Williams regarding the gift tax that would have been associated with the "potential gift of her $125 million interest in the [P]artnership" if she decided to dispose of that interest via gift prior to her death.  Dkt. No. 75-6 at 191-92. That gift, however, never occurred. *Id.*

41.  Rayford Keller testified that Exhibit 22 was shown to Mrs. Williams at her home during a September 1999 meeting that was also attended by Lane Keller.  He further testified that his understanding after the meeting was that he and Lane Keller should proceed with forming the Investment Partnership to conform with the numbers (approximately $250 million in Bonds) as set forth in the final column of Exhibit 22 labeled "FUNDING PARTNERSHIP."

42.  Lane Keller testified that his understanding of the advisors' "marching orders" after the September 1999 meeting was that "[w]e were to move forward with the drafting of the [I]nvestment [P]artnership and the subsequent funding of the [P]artnership." *Id.* at 193.  He further testified that he viewed those directions "as being final." *Id.*

43.  Though there was testimonial evidence that Mrs. Williams reviewed Exhibit 22, it does not appear that she signed it or otherwise left any writing referencing her approval of the transfer of the amounts stated in the spreadsheet.  And, indeed, no witness testified that she did so or that such a writing exists.

44.  After the September 1999 meeting, the Kellers contacted the Williamses' attorney in Dallas, Sandy Bisignano, and instructed him to draft partnership papers pursuant to Mrs. Williams'

instructions to the Kellers at that meeting.

45.    Bisignano finished the first draft of the Partnership Agreement ("Partnership Agreement" or "Agreement") before the end of September 1999.  That draft was distributed to Lane Keller, Rayford Keller, and Michael Anderson.  After suggesting various changes, the advisors sent the draft back to Bisignano, who incorporated the group's edits and resubmitted a new draft.  This process of drafting, editing, and re-drafting carried on through the fall of 1999. *See* Pls.' Exs. 23, 25, 27, 29, 33, 42. Mrs. Williams was not shown any of the preliminary drafts until the group produced what it considered to be a nearly-final draft in January 2000.

46.    The Kellers also understood that the Investment Partnership's general partner was to be a limited liability company funded by Mrs. Williams with $300,000 in cash.  Initially, Mrs. Williams would own 100 percent of the stock in the corporate general partner, but would sell it to Ann Harithas and Michael Anderson and his brother, another grandson, named Steve Anderson.  Bisignano circulated drafts of the formation papers for the general partner during the same period—late 1999 and early 2000—that drafts of the Partnership Agreement were being circulated among the group.

47.    On January 20, 2000, Lane Keller wrote an e-mail to Michael Anderson (Pls.' Ex. 50) that reads as follows: "I have reviewed the [A]greement and corporate docs and have only minor change[s] which I covered with Tom [Neuhoff, another attorney at Bisignano's office in Dallas who worked on the Williams matter].  Have you reviewed docs?  Ready to Roll?"  Accordingly, Lane Keller testified that he "felt like the Partnership was done and ready by early January" and asked Mike Anderson and Rayford Keller if they were "ready to finish

up the Partnership." Dkt. No. 75-5 at 196.

48.   However , the papers for the Investment Partnership and the corporate general partner were not signed at this time because of additional changes to the agreements that, in effect, further restricted the potential that Partnership interests or shares of the corporate general partner might pass to non-blood relatives. *Id.* at 197. Mrs. Williams was involved in ordering these changes. *Id.*

49.   In January 2000, Lane Keller produced a flowchart and a set of notes (Pls.' Ex. 2) for the purpose of demonstrating to Lynn Miori, his associate, the plans for funding the Investment Partnership out of the various trust accounts in which the Community Property Bonds that were to go into the Investment Partnership were held.  The flowchart and accompanying notes indicates that Lane Keller understood Mrs. Williams to have specific and definite plans for an investment entity and had begun to work out in detail the mechanics of how to fund the Partnership that was to be formed via the draft agreements that Bisignano had drafted and that the advisors had reviewed and edited.  Pls.' Ex. 2; Dkt. No. 75-5 at 123-26.

50.   Despite moving forward with the plans to form an entity comprised of approximately $250 million worth of Bonds, Lane Keller testified that he attempted on several occasions in August and September 1999 to persuade Mrs. Williams to allocate more assets to the Investment Partnership.  However, those efforts were rebuffed by Mrs. Williams.  Consistent with her character as described by the Kellers, Mrs. Williams played an active role in the allocation and protection of her wealth up to the time of her passing.

51.   Apart from the sizeable amount of assets scheduled to be transferred to the Investment Partnership, Mrs. Williams had at her disposal other assets totaling in excess of $110 million.

14

Dkt. No. 75-3 at 85; Dkt. No. 75-4 at 140; Dkt. No. 75-5 at 192.

52.     The advisors continued to work on the drafts of the papers for the Investment Partnership and the corporate general partner throughout the spring of 2000. Although the formation documents were occasionally modified during this period, the structure, purpose, and intended contributions to the entity remained the same.

53.     In March 2000, the family and Mrs. Williams' advisors learned that Mrs. Williams had been diagnosed with cancer.  This news, however, was tempered by the fact that her physicians did not believe, at that time, that her death was imminent.

54.     On May 9, 2000, separate sets of what the advisors agreed were final drafts of the Partnership papers and the incorporation papers for the corporate general partner were in Bisignano's offices in Dallas.  On that date, Bisignano gave the drafts to Michael Anderson, who lives in Dallas and who was on his way to catch a flight to Victoria that evening.

55.     After arriving in Victoria late in the evening of May 9, Michael Anderson gave the two sets of papers to Lane Keller, who contacted Mrs. Williams in her hospital room and arranged to meet with her that evening to review the documents.  After arranging to meet with Mrs. Williams, Lane Keller took the Partnership Agreement (Defs.' Ex. 21) and the incorporation papers for the corporate general partner (Defs.' Ex. 12-15) to Mrs. Williams in her Victoria hospital room.

56.     Lane Keller's meeting that evening with Mrs. Williams lasted approximately two hours. Bisignano had marked numerous changes on the two sets of papers that were sent via Michael Anderson from Dallas to Victoria.  Lane Keller went over each of those changes with Mrs. Williams in detail.  He also showed her all of the documents to be signed and

15

explained each of them to her such that he was satisfied that, despite her condition, she was fully cogent under the circumstances and understood what she was doing.

57. At no time was Mrs. Williams mentally or physically incapacitated to the extent that it would in any way inhibit her from fully understanding the legal ramifications of her actions.

58. After reviewing the Partnership Agreement one final time, Mrs. Williams signed the Agreement five times: once in her capacity as trustee of Share M, once in her capacity as trustee of share A, once as president of the corporate general partner, and twice more in her capacities as trustee of Trust M and Trust A in approval and acceptance of her own signature as president of the corporate general partner. All executing signatures were notarized by Lane Keller.

59. Article IX of the Agreement, titled "Capital Accounts," provides for the establishment of capital accounts in which the contributions of each partner were to be credited to the partner's respective capital account, Defs.' Ex. 21 at W 023346, and the partners were to receive their capital accounts in the event of liquidation, "in accordance with their Percentage Interests." *Id.* at W 023368.

60. Article VIII of the Partnership Agreement, titled "Capital Contributions," contains a ¶8.1, which provides as follows: "Each Partner shall contribute to the Partnership, as his initial Capital Contribution, the property described in Schedule A attached as part of the Agreement." *Id.* at W 023344.

61. The signature page for the limited partner is the second page of a section of the Agreement titled "Subscription and Acceptance by Limited Partner." *Id.* at W 023378. The first paragraph of that section indicates that Mrs. Williams, by signing as trustee of the two

16

limited partner trusts, "acknowledge[d] and confirm[ed] my subscription to a Limited Partnership Interest in the Partnership equal to the value of property to be contributed to the Partnership by me as a percentage of the value of all property contributed to the Partnership, and agree[d] to transfer my required contribution of capital to the Partnership upon the Effective Date, and upon notice of the General Partner to make the contribution according to my subscribed interest." *Id.*

62.     The last page of the Partnership Agreement is Schedule A, which was explicitly referenced in the "Capital Contributions" section and impliedly referenced in the "Subscription and Acceptance by Limited Partner" section. *See id.* at W 023344, W 023378. Schedule A, which is also titled "Each Partner's Percentage Interest," is set forth in three rows and four columns and describes the contributions required of the two limited partner trusts and the corporate general partner. Specifically, the corporate general partner was to own .1 percent interest in the Partnership and the two limited partner trusts were each to own 49.95 percent. Defs.' Ex. 21 at W 023380.

63.     The last column of Schedule A is titled "Initial Capital Contribution" and has a dollar sign next to three blank spaces for the amount to be contributed by each partner. *Id.*

64.     All of the blanks in the last column of Schedule A are empty. *Id.*

65.     The initial capital contributions that were to be inserted into these blanks are not otherwise discernable from anything located within the Partnership Agreement itself. Moreover, before Mrs. Williams' passing, no other Partnership documents existed, signed by the limited partners, indicating what the required contributions were to be or that the limited partners were required to make them.

66.  In accordance with the Partnership Agreement and Texas partnership law, Mrs. Williams did not have the unilateral right to alter, amend, revoke, or terminate the Agreement, nor could she dissolve the Agreement on her own accord. *See* Defs'. Ex. 21; TEX. REV. CIV. STAT. ANN. art. 6132b § 18(h).

67.  In addition to the Partnership Agreement, Mrs. Williams also signed a number of papers for the corporate general partner evidencing that care was taken by Mrs. Williams and Lane Keller to observe the corporate formalities required under Texas law, including, inter alia, a unanimous consent in lieu of organizational meeting. She also signed the filing papers for the Investment Partnership that were required to be filed with the Texas Secretary of State. Finally, she signed some unrelated papers on behalf of Martin O'Connor Cattle Company.

68.  After leaving Mrs. Williams at the hospital, Lane Keller testified he was under the impression that "everything had been signed, filings [with the state] would take place subsequently and we were ready to finalize the [P]artnership." Dkt. No. 75-7 at 219. He further testified that he had "[n]o question" as to the assets that were to go into the Partnership via the subscription agreement: the Community Property Bonds. *Id.*

69.  Lane Keller explained that the only reason that the dollar amounts on Schedule A were left blank was because "I didn't have the firm market value of the [B]onds to be contributed to the partnership at that time." Dkt. No. 75-7 at 220. Rather, "on the date that the [B]onds are to be transferred to the [P]artnership ... the fair market value would be determined and the corporate general partner's contribution amount would be calculated, and that would be the number that gets filled in those blanks." *Id.* Finally, Lane Keller explained that determining the fair market value of the Bonds as of the date of transfer required more than determining

the value on that date.  The calculations also would have had to take into account the interest accrued as of that date and the book values of the Bonds to be transferred.  In other words, "[i]t's not a straightforward printout of the market value of the [B]onds and put a number in the Schedule A."  Dkt. No. 75-7 at 221-22.  Lane Keller estimated that it would have taken several days to complete the valuation calculations.

70.    Lane Keller testified that on the following day, May 10, 2000, he moved forward with the various tasks that would be required to fund the Partnership.  He applied for tax identification numbers and spoke with representatives of the Vanguard Group about new accounts to serve as repositories for the Partnership assets in the name of the limited partner trusts and the corporate general partner.

71.    Also on May 10, 2000, Rayford Keller wrote a series of notes on a printed e-mail (Pls.' Ex. 66) from the previous day that Lane Keller had received from Tom Neuhoff.  Rayford Keller's handwritten notes include the following statement: "Mrs W. put in $300 M, $250 M of which will be invested in MOW/RPW, LTD (the name of the Investment Partnership)." Pls.' Ex. 66.  Lane Keller also made several handwritten notes on the e-mail setting forth his plans moving forward.

72.    On the same day, Lane Keller cut an unsigned check (Pls.' Ex. 71) for $300,000 from one of the Family Trust accounts payable to the corporate general partner.  The check was never signed by Mrs. Williams.

73.    Apparently, Lane Keller's plan after May 10 was to (1) open new Vanguard accounts immediately after receiving the tax identification numbers for which he had applied; (2) formally fund the Partnership with the Bonds held by the limited partnership trusts; and (3)

19

formally fund the corporate general partner with the $300,000 check that he had prepared for Mrs. Williams' signature.  He testified that he expected to accomplish this the following week, the week of May 15, after Mrs. Williams came home from the hospital, as she was scheduled to be released over the weekend.

74.     On May 11, 2000, the Articles of Incorporation of Management Company were filed with the Texas Secretary of State, and a Certificate of Incorporation was issued.  Also on May 11, the Certificate of Limited Partnership was filed with the Texas Secretary of State.

75.     Mrs. Williams died shortly thereafter, on May 15, 2000, before Lane Keller received the tax identification numbers, before he was able to open the new Vanguard accounts, before he was able to formally fund the limited partnership trusts, and before he was able to present the check for $300,000 to Mrs. Williams for her signature to formally fund the corporate general partner.

76.     After Mrs. Williams' death in May 2000, those who had been working on the formation of the Partnership essentially stood down, ceasing all activity with respect to the Partnership, the corporate general partner, and the transfer of assets.  At this time, no assets had been formally transferred to the Partnership and Schedule A remained blank.

77.     At the time of Mrs. Williams' passing, Mrs. Williams' advisors did not feel that the Partnership had been properly formed or that they had an obligation to document the intended transfer of Bonds to the Partnership.

78.     Accordingly, on or about February 12, 2001, a check in the amount of $147,800,245 was drawn from accounts relating to the Family Trust and made payable to the United States

Treasury with a Form 4768[2] with respect to Mrs. Williams' estate.  Defs.' Ex. 28.  The check

was accompanied by a request for an extension to file the estate's federal tax return.

79.      Following Mrs. Williams' death, the period of inactivity concerning the Investment

Partnership, general partner, and transfer of assets lasted for approximately twelve months,

until May 17, 2001, when Lane Keller attended an estate planning seminar in Victoria.  At

this seminar, one of the speakers described a recent judicial opinion by a federal district

court in the Western District of Texas, *Church v. United States*. No. SA-97-CA-0774-OG,

2000 WL 206374 (W.D. Tex. Jan. 18, 2000).  Lane Keller testified that the discussion at the

seminar about the *Church* case, which also dealt with an aborted family partnership, gave

him some hope that his and the advisors' efforts with Mrs. Williams before her death had

been successful after all, and that they had, in fact, formed and funded a viable family

partnership.

80.      After the seminar, Lane Keller notified his father and members of the Williams family,

informed them of his understanding of the *Church* case, and advised them that they should

quickly move forward with all of the formalities that had been left undone a year earlier and

seek the advice of a tax litigator regarding what effect such efforts might have on the estate

tax burden on Mrs. Williams' estate.  Upon Lane Keller's notification, Mrs. Williams'

advisors sprang into action and resumed their efforts with respect to formally establishing

the Investment Partnership.  These efforts included the formal recorded transfer of the

Community Property Bonds to the Partnership.

81.      On or about August 14, 2001, Mrs. Williams' estate filed a Form 706, United States Estate

---

[2] Form 4768 is an Application for Extension of Time to File a Return and/or Pay U.S. Estate (and Generation-Skipping Transfer) Taxes.

Tax Return.  Defs.' Ex. 29.  The return was prepared by Lane Keller and signed by the executors, Michael Anderson, Ann Harithas, and Rayford Keller.  *Id.*  Of the total $383,669,668 gross estate, $368,766,230 was attributable to Trust A and Trust M.  *Id.*  Of the $368,766,230 value of the trust, $260,781,622 was attributable to the Trusts' interest in the Partnership.  *Id.*  The estate's reported estate tax liability was $143,450,169.  *Id.*  Mrs. Williams' estate did not claim any valuation discounts on the return.

82. The Form 706 included in Mrs. Williams' gross estate the assets of Trust M, a Q-Tip trust (under I.R.C. § 2044), and Trust A (under I.R.C. § 2036).

83. On or about November 15, 2001, Mrs. Williams' estate filed a Form 843, Claim for a Refund and Request for Abatement, amending the original 706.  Dkt. No. 1, Ex. A.  The Claim for Refund requested a refund of $40,455,332, or such other amount as is legally and/or equitably refundable, together with interest thereon.  *Id.*  When the Government did not act upon the refund request within six months, Mrs. Williams' estate filed its Complaint in this Court on July 5, 2002 seeking the refund.  Dkt. No. 1.

84. Despite the fact the Mrs. Williams passed away before certain formalities were observed, the Court finds it clear that, at the time of her death, she intended the Community Property Bonds to be Partnership property.

85. Similarly, the Court finds that, at the time of her passing, Mrs. Williams intended that the corporate general partner be capitalized with the $300,000 check cut by Lane Keller and agreed to sell the stock in the general partner to Ann Harithas, Michael Anderson, and Steve Anderson. In accordance with Texas law, this agreement was enforceable because, among other things, the executors of Mrs. Williams' estate had a duty to complete the transactions

22

surrounding the general partner's formation.

86.  Mrs. Williams, as trustee of Trust A and Trust M, and as the initial sole owner of the general partner, represented all of the partners, and therefore her intent was the intent of all the partners at the time of the Partnership's formation.

87.  Pursuant to Texas law, and as discussed below, the Court therefore finds that the Community Property Bonds were Partnership property.

88.  Accordingly, the Partnership was fully formed prior to Mrs. Williams' death and the Community Property Bonds were beneficially owned by the Investment Partnership upon its creation. Trust A and Trust M each owned a 49.95 percent limited partnership interest in the Partnership before Mrs. Williams' death.

89.  Upon Mrs. Williams' death, Trust A and Trust M, by operation of the Family Trust agreement, automatically terminated, and their assets were divided into six follow-on trusts intended to benefit the Williamses' grandchildren. In accordance with the Partnership Agreement and Texas law, the transfer of Trust A and Trust M's limited partnership interests caused by Mrs. Williams' passing changed the nature of the interests to assignee interests.

90.  During the bench trial, the parties' experts testified to the valuation discounts potentially applicable to Mrs. Williams' interests in the Investment Partnership. The primary discounts addressed included (1) marketability discounts and (2) lack of control discounts.

91.  The Court finds that the Plaintiffs' expert, Mr. Robert Reilly, used the correct standard in determining the fair market value of Mrs. Williams' interests at the date of her death. The Government's expert, Dr. Alan Shapiro, violated several of the tenets of the hypothetical buyer and seller standard, including considering the true identities of the buyer and seller,

speculating as to events occurring after the valuation date, and aggregating the interests of different owners. Defs.' Ex. 49 at 12-16; Dkt. No. 77-1 at 494-95; Dkt. No. 77-3 at 590-91; 77-4 at 604-06. Moreover, the Court finds that the most appropriate valuation method in this case is the asset-based approach employed by Mr. Reilly.

92. Crediting the testimony of Mr. Reilly, and disregarding that of Dr. Shapiro, and in light of the hypothetical buyer and seller standard applicable to this case, the fair market value of the Partnership's assets, as of the date of Mrs. Williams' death, was $261,042,664.

93. The Court further finds that the fair market value of Trust A and Trust M's assignee interests in the Partnership was $68,439,000 each.

94. Finally, after Mrs. Williams' advisors determined that the Partnership had indeed been established, and with an eye towards preserving the liquidity of Mrs. Williams' estate, the estate (and the Family Trust) borrowed certain funds from the Partnership to pay the federal estate taxes, Texas inheritance taxes, and other debts and obligations arising from the Partnership. *See* 75-6 at 238-41; Pls.' Ex. 96. The note totaled $114 million and is due February 15, 2010, with interest on the note accruing at the rate of 5.07 percent per annum. *Id.* The interest payments made on the note amount to approximately $30 million, have been paid to the Partnership, and have been reported as income to the Partnership. *Id.* The interest income has passed to Ann Harithas, Michael Anderson, and Steven Anderson, each of whom has paid income tax on such amounts. *Id.*

95. The Court finds that this loan was an actual and necessary administration expense as that term is used in estate taxation law. Accordingly, the interest deduction claimed therefrom is allowable.

96.    The Court further finds that Plaintiffs have actually and necessarily incurred attorney's fees and miscellaneous administrative expenses such as court costs, accountants' fees, executor and trustee fees, and appraisers' fees in seeking a refund through this action. Although the amount of these expenses are not known to the Court, the Court finds them to be permissible, additional deductions from the federal estate tax heretofore paid. TRES. REG. § 20.2053-3(c)(2), (d)(1).

**Conclusions of Law**

1.    Well-established principles of Texas law provide that the intent of an owner to make an asset partnership property will cause the asset to be property of the partnership. *Church v. United States*, No. SA-97-CA-0774-OG, 2000 WL 206374, at *7 (W.D. Tex. Jan. 18, 2000); *Biggs v. First Nat'l Bank of Lubbock*, 808 S.W. 2d 232, 237 (Tex. App.—El Paso 1991, writ denied); *King v. Evans*, 791 S.W.2d 531, 532 (Tex. App. – San Antonio 1990, writ denied); *Logan v. Logan*, 156 S.W. 2d 507, 512 (Tex. 1941).

2.    This is the case whether or not legal or record title to the property has yet been transferred. *Church*, 2000 WL 206374 at *7 (*citing Logan*, 156 S.W. 2d at 512)); *see also Biggs*, 808 S.W. 2d at 237 ("Under well-established partnership principles, ownership of property intended to be a partnership asset is not determined by legal title."). Specifically, the failure to affect an internal change to the Vanguard accounts prior to Mrs. Williams' passing was not necessary to make the Community Property Bonds property of the Partnership. Mrs. Williams' advisors' failure to finalize the Partnership documentation immediately following Mrs. Williams' death also does nothing to alter the legal effect of her intent that the Community Property Bonds be transferred to the Partnership. *See Succession of McCord v.*

*Commissioner*, 46 F.3d 614, 626 (5th Cir. 2006); *Estate of Smith v. United States*, 198 F.3d 515, 521 (5th Cir. 1999).

3.     Moreover, Mrs. Williams was obligated to fund the general partner and assign her stock to Ann Harithas, Michael Anderson, and Steve Anderson. *See* TEX. BUS. & COM. CODE ANN. § 8.113; *Neyland v. Brammer*, 73 S.W. 2d 884, 888 (Tex. Civ. App.—Galveston 1993); *see also  Cardwell v. Sicola-Cardwell*, 978 S.W. 2d 722, 726 (Tex. Civ. App.—Austin 1998) ("[C]ontractual obligations generally survive the death of a party and bind his estate if the contract is capable of being performed by the estate representatives.").

4.     Because Plaintiffs have established that Mrs. Williams  intended to transfer the Community Property Bonds to the Partnership at the time she signed the Partnership Agreement, and that the Partnership was a valid Texas limited partnership before Mrs. Williams' death, the assets are considered partnership property before her passing, and Mrs. Williams' estate may be able to obtain a refund for taxes paid. *See* I.R.C. §§ 2033, 7701(a)(2).

5.     Despite already finding that Mrs. Williams intended to transfer the Community Property Bonds to the legally operative Partnership, the Court must comment on whether some or all of the evidence regarding Mrs. Williams' intent as to the amount and source of the assets that were earmarked to be transferred from Trust M and Trust A into the Investment Partnership should be excluded in light of (1) the Fifth Circuit rule imposing a qualified ban on parol evidence in federal tax cases as stated in *Deshotels v. United States*, 450 F.2d 961 (5th Cir. 1972); (2) the various hearsay objections raised by the Government; and (3) the Texas "Dead Man's Rule," as codified at TEX. R. EVID. 601(b). The applicability and scope of these rules is crucial, given that the Court has found that (1) Mrs. Williams did not leave any writings

regarding her intent as to the amount and source of such assets; (2) the Partnership Agreement and Schedule A are silent as to these two essential pieces of information; and (3) at the time of Mrs. Williams' death, no other Partnership documents existed, signed by the limited partners, indicating what the required contributions were to be.

6. Despite the Government's contention that parol evidence is not admissible in litigation concerning federal taxes, *Deshotels* merely stands for the proposition that, in cases involving federal tax interests, the clear terms of a contract cannot usually be contradicted by parol evidence testimony. *See Deshotels*, 450 F.2d at 967 ("We hold only that the taxpayer cannot sustain the burden of proving his right to a deduction merely by introducing the parol evidence to controvert the traditional state law meaning of words of a contract affecting the taxpayer's federal tax liability."); *see also Atlantic Lloyds Ins. Co. v. Butler*, 137 S.W.3d 199, 211 (Tex. App.—Houston [1st Dist.] 2004) ("Where a writing is incomplete [] parol evidence is admissible to explain the writing or to assist in the ascertainment of the true intentions of the parties insofar as the parol evidence does not alter or contradict any part of the written memorandum in question."). Here, the testimony of the Kellers and their associates, supported by the written documents of Mrs. Williams' various agents—principally Plaintiffs' Exhibits 2, 22, and 66—explain rather than controvert the contract term at issue. The statements made by Mrs. Williams' legal and financial advisors shed light on the fact that Schedule A was intended to include the Community Property Bonds and thus they fall outside of the rule laid down in *Deshotels*.

7. The *Deshotels* court, moreover, noted in dicta that "[p]erhaps parol evidence would be enough to tip the scales toward the taxpayer's interpretation in a case where he had offered

27

*substantial corroborating evidence in addition to the testimony of the contracting parties in support of his position*."  *Id.* (emphasis added); *see also Sellers v. United States*, 615 F.2d 1066 (5th Cir. 1980) (upholding a district court's consideration of parol evidence, including testimony as to the taxpayer's subjective intent, based on the surrounding factual circumstances); *Sharewell, Inc. v. Commissioner*, T.C. Memo 1999-413, 1999 WL 1220102, at *7 (U.S. Tax Ct. 1999) (discussing *Deshotels* and *Sellers* and concluding that "parol testimony, if substantially corroborated, is indeed sufficient to change the terms of a written contract); *Utility Fuels, Inc. v. Whittaker Corp.*, Civ. A. No. H-84-2046,1986 WL 14835, at *5 n.2 (S.D. Tex. 1986) (distinguishing *Deshotels* and allowing parol evidence when the plaintiff's "declaration[] of [his] intent is supported by one reasonable interpretation of the agreement").

8.   The Court finds it clear that based on the surrounding circumstances, Mrs. Williams intended the Community Property Bonds to capitalize the Partnership. The Kellers and their team of financial and legal advisors, with notable consistency, conveyed through their testimony and related documents that Mrs. Williams intended the Community Property Bonds to be transferred to the Partnership.  *See* Dkt. No. 75-2 at 62, 72-82; Dkt. No. 75-3 at 94-96; Dkt. No. 75-4 at 146; Dkt. No. 75-5 at 190-93; Dkt. No. 75-6 at 228-29; Pls' Exs. 2, 22, 66. Furthermore, their actions and correspondence both before and after Mrs. Williams' passing sufficiently corroborate their testimony.

9.   Exhibit 22, the spreadsheet created by Rayford Keller describing Mrs. Williams' various assets, their respective locations, and those contemplated to become Partnership property, and Exhibit 66, the handwritten notes made by the Kellers concerning Mrs. Williams' intent

that Community Property Bonds fund the Partnership, are both admissible under several exceptions to the hearsay rule.

10.   To satisfy the business records exception to the hearsay rule, a document must be prepared in the normal course of business, at or near the time of the events they record, and based on the personal knowledge of the party transmitting the information. *See* FED. R. EVID. 803(6); *Datamatic Servs., Inc. v. United States*, 909 F.2d 1029, 1032-33 (7th Cir. 1990). Exhibits 22 and 66 were both prepared in the normal course of business by individuals with personal knowledge of the information being transcribed. Exhibit 22 was created in reaction to the numerous meetings and discussions the Kellers had with Mrs. Williams regarding the formation of the Partnership and the assets that were contemplated to become Partnership property. Exhibit 66 was prepared on May 10, 2000, two days after Bisignano outlined the sequence of events to follow the finalization of the Partnership Agreement and just one day after Mrs. Williams signed the Agreement's various component parts. That the Kellers were Mrs. Williams' closely trusted fiduciaries with a duty to faithfully carry out her financial plans further bolsters the integrity of the contested evidence. *See Hoselton v. Metz Banking Co.*, 48 F.3d 1056, 1061 (8th Cir. 1995) (holding that the notes of an accountant who owes fiduciary responsibilities to his client bear sufficient indicia of trustworthiness so that they would be admissible under Rule 803(6)). The Kellers' uniquely close relationship with the Williamses removes from the Court any doubt as to the trustworthiness of the documents and surrounding testimony. Accordingly, both documents are admissible under FED. R. EVID. 803(6)).

11.   Exhibits 22 and 66, furthermore, are admissible under the residual exception to the hearsay

rule found in FED. R. EVID. 807. Pursuant to Rule 807, a statement otherwise classified as inadmissible hearsay should be admitted if it (1) exhibits "circumstantial guarantees of trustworthiness" similar to those set forth in Rules 803 and 804; (2) "is offered as evidence of a material fact;" (3) "is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts;" and (4) "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."

12.     Exhibits 22 and 66 satisfy each of the above criteria. First, based on the Court's discussion above, the Exhibits and the statements contained therein are sufficiently corroborated and trustworthy. Though the Court is aware that Rule 807's element of trustworthiness requires "a showing of particularized guarantee[s] of trustworthiness," *Idaho v. Wright*, 497 U.S. 805, 816 (1990), the Court concludes that such a bar has been reached here. Second, the documents constitute probative evidence of Mrs. Williams' intent as conveyed by her agents. Finally, and most notably, the Court concludes that the interests of justice will be served by admission of the evidence at issue as every shred of live testimony, documentary evidence, and the surrounding factual circumstances fully support the statements revealed by the contested Exhibits.

13.     Testimony regarding Mrs. Williams' statements as to her intent to place the Community Property Bonds into the Partnership are admissible as evidence of her state of mind. *See* FED. R. EVID. 803(3). Under Rule 803(3), a statement that would otherwise be inadmissible hearsay is admissible if it reveals "the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain,

and bodily health).” The statements offered at trial reveal Mrs. Williams’ intent that the Bonds fund the Partnership and they are therefore admissible. *See Shelden v. Barre Belt Granite Employer Union Pension Fund*, 25 F.3d 74, 80 (2d Cir. 1994) (“the existence of the plan or intention may be proven by evidence of ‘the person’s own statement as to its existence’”) (*citing Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 294-300 (1892)); *Morris Jewelers, Inc. v. General Elec. Credit Corp.*, 714 F.2d 32, 34 (5th Cir. 1983) (distinguishing *Prather v. Prather*, 650 F.2d 88 (5th Cir. 1981), and allowing evidence of state of mind under Rule 803(3) because of the evidence’s relevance to the underlying matter). For the reasons stated above, moreover, the Court would admit testimony as to Mrs. Williams’ statements under the residual exception to the hearsay rule.

14.  The Texas Dead Man’s Rule also does not exclude the evidence Plaintiffs proffer to establish Mrs. Williams’ intent that the Community Property Bonds be Partnership property.  As an initial matter, the Texas Dead Man’s Rule does not apply to federal tax disputes. Although FED. R. EVID. 601 provides that in civil cases where state law supplies the “rule of decision” concerning a claim or defense, state law is used to determine a witness’ competency, the rule of decision in federal question cases is federal law. *See Longoria v. Wilson*, 730 F.2d 300, 304-05 (5th Cir. 1984) (“Although it is true that under F[ED]. R. EVID. 601 the competency of a witness is to be ‘determined in accordance with State law,’ *that rule is limited to cases where ‘State law supplies the rule of decision,’ or diversity cases.*”) (emphasis added); *Estate of Powell v. United States*, 271 F. Supp. 2d 880, 893 (W.D. Va. 2001), *rev’d on other grounds*, IRS Chief Counsel Advisory 200504028, 2005 WL 190322 (IRS CCA) (refusing to apply a state dead man statute to a federal gift tax case); *United States v. Diehl*, 460 F.

31

Supp. 1282, 1289 (S.D. Tex. 1978) (observing that in the context of a federal tax dispute, it is "clear that the applicability of state Dead Man Acts in federal court is limited to diversity actions"). The fact that principles of Texas law serve as a gap filler in this case does not mean that Texas law supplies the rule of decision. *See Hanes v. Mid-American Petroleum, Inc.*, 577 F. Supp. 637, 645 (W.D. Mo. 1983) (*citing United States v. Kimbell Foods*, 440 U.S. 715, 718 (1979)).

15.    Even if the Texas Dead Man's Rule were to apply, the rule allows for admissibility of the oral statements at issue if other evidence provides sufficient corroboration. *See* TEX. R. EVID. 601(b); *Powers v. McDaniel*, 785 S.W. 2d 915, 920-21 (Tex. App—San Antonio 1990, writ denied). Based on the discussion above, particularly that surrounding Exhibits 22 and 66, the Court concludes that the circumstances surrounding the testimony as to Mrs. Williams' oral statements concerning her intent over the Community Property Bonds provide sufficient indicia of reliability as to warrant their admissibility.

16.    Federal estate tax is imposed on property a decedent transfers at death regardless of the nature of the property interest.  I.R.C. § 2033; *Estate of Bright v. United States*, 658 F.2d 999, 1001 (5th Cir. 1981). Internal Revenue Code Sections 2036(a) and 2038(a) are intended to prevent parties from avoiding the estate tax by means of testamentary substitutes that permit a transferor to retain lifetime enjoyment of purportedly transferred property, or, in the case of Section 2038(a), that permit a transferor to alter, amend, revoke, or terminate the power to control the transferred interest.

17.    In relevant part, Section 2036(a) provides that

> The value of the gross estate shall include the value of all property *to the extent of any interest therein of which the decedent has at any*

> *time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth*), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—
>
>> (1) the possession or enjoyment of, or the right to the income from, the property, or
>>
>> (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

I.R.C. § 2036(a) (emphasis added)

18.     Section 2038(a), employing language identical to that found in Section 2036(a), provides, in pertinent part, that

> The value of the gross estate shall include the value of all property ... *[t]o the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth*), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate . . ..

I.R.C. § 2038(a)(1) (emphasis added)

19.     Neither Section applies, however, if the transfer is a "bona fide sale for an adequate and full consideration in money or money's worth." *Strangi v. Commissioner*, 417 F.3d 468, 478 (5th Cir. 2005); *Kimbell v. United States*, 371 F.2d 257, 261 (5th Cir. 2004). The determination as to whether a transfer is a bona fide sale is an entirely objective inquiry. *Kimbell*, 371 F.3d at 263-64.

20.     A "bona fide sale" is a sale that, rather than being a disguised gift or sham transaction, is one made in good faith. *Kimbell*, 371 F.3d at 263 (*citing Wheeler v. United States*, 116 F.3d 749,

767 (5th Cir. 1997) and 26 C.F.R. §§ 20.2036-1(a) & 20.2043-1(a)). However, if the transaction is motivated solely by potential tax advantage and without a business purpose, the transaction is ignored for tax purposes. *Kimbell*, 371 F.3d at 264. That the transferor retains sufficient assets outside of the partnership to meet his personal needs supports the conclusion that the transfer was affected through a bond fide sale. *Id.* at 267. The fact that family members might only make de minimus contribution to the partnership does not, in and of itself, require a court to conclude that the transaction was a sham or disguised gift. *Id.* at 268.

21. Mrs. Williams' transfer of the Community Property Bonds to the Partnership was a bona fide sale. First, the lengthy discussions that went into creating the Partnership Agreement, which Mrs. Williams signed, provide sufficient objective evidence that the Partnership transaction was "real, actual, genuine, and not feigned." *Kimbell*, 371 F.3d at 263. Second, the primary purpose underlying the Partnership's formation was to protect family assets from depletion by ex-spouses through divorce proceedings. This was accomplished by creating an entity that, by altering the legal relationship between Mrs. Williams and her heirs, could facilitate the administration of significant family assets. In other words, the creation and funding of the Partnership was undertaken for a legitimate business purpose and not the mere "recycling" of wealth. Finally, the fact that Mrs. Williams had a significant collection of assets outside of the Partnership—well over $100 million—further supports the conclusion that the transfer was made pursuant to a bona fide sale.

22. Courts are to consider a variety of factors when determining whether a transfer is for full and adequate consideration, such as: "(1) whether the interests credited to each of the partners

34

was proportionate to the fair market value of the assets each partner contributed to the partnership, (2) whether the assets contributed by each partner to the partnership were properly credited to the respective capital accounts of the partners, and (3) whether on termination or dissolution of the partnership the partners were entitled to distributions from the partnership in amounts equal to their respective capital accounts." *Id.* at 266.

23.   Mrs. Williams' transfer was made for full and adequate consideration. First, the "Subscription and Acceptance by Limited Partner" portion of the Partnership Agreement provides that the percentage interests of the partners are proportionate to their respective contributions. The Agreement also sets forth the capital accounts in which the contributions of a partner are credited to the respective capital account of the partner. Finally, the Partnership agreement provides that, upon liquidation, the partners are to receive their capital accounts in accordance with their percentage interests.

24.   Although the Government relies on *Strangi v. Commissioner*, 417 F.3d 468 (5th Cir. 2005), the facts of *Strangi* are distinguishable from those present here.  In *Strangi*, the Fifth Circuit upheld the tax court's ruling that because the decedent retained enjoyment of the assets transferred to a partnership, the property was properly included in the taxable estate under Section 2036(a). The *Strangi* court concluded that an implied agreement existed between Strangi and his son-and-law (who possessed power of attorney) that Strangi would retain possession or enjoyment of the property. The circumstantial evidence that led the *Strangi* court to conclude that an implied agreement was in place does not exist here. In *Strangi*, the Court pointed to the fact that Strangi transferred almost his entire accumulated wealth to the partnership, relied on partnership funds to satisfy his various post-transfer financial needs,

and continued to live at the residence that comprised a portion of the partnership's corpus. Here, Mrs. Williams withheld significant funds in which to comfortably live the remainder of her life and thus had no need to rely on the Partnership's assets. Accordingly, the Court cannot conclude that she retained possession or enjoyment of the Community Property Bonds at issue. The *Strangi* court also found that the decedent's transfer of assets lacked a substantial non-tax purpose and thus could not be considered a bona-fide sale. As noted above, that is not the case here.

25. Accordingly Sections 2036(a) and 2038(a) do not apply to the transfer of any assets to the Partnership.

26. The value of Trust A and Trust M's interest in the Partnership are to be, and have been, established by applying the hypothetical buyer and seller method, by which fair market value is not determined by the price which would be paid by the heirs or any specific remaining owners of the business entity, but rather by the price a hypothetical buyer would pay for the actual property transferred. I.R.C. § 2031; TREAS. REG. § 20.2031-1(b); *Estate of Bright v. United States*, 658 F.2d 999, 1000-06 (5th Cir. 1981) (discussing the concept of the hypothetical buyer and seller and observing that the sum of fractional interests in a property is less than the whole); *see also Estate of Simplot v. Commissioner*, 249 F.3d 1191, 1195 (9th Cir. 2001) (speculation as to future events after the valuation date are impermissible); *Estate v. Bonner v. United* States, 84 F.3d 196, 198 (5th Cir. 1996) (aggregation or merger of ownership interests is impermissible).

27. This evaluation is to take into account the rights and obligations transferred, which in this case are assignee interests that did not result in the dissolution of the limited partnership. *See*

TEX. REV. CIV. STAT. art. 6132a-1 §§ 7.02(a)(2), 7.04(a), 8.01; *7547 Corp. v. Parker &
Parsley Dev. Partners*, 38 F.3d 211, 219 (5th Cir. 1994); ALAN R. BROMBERG & LARRY E.
RIBSTEIN, *Bromberg and Ribstein on Partnership*, § 13.06 at 13:35 (Supp. 2002-1)
(indicating the assignment of an interest of a limited partner does not necessitate the
dissolution of a limited partnership).

28.     When determining the fair market value of an interest in a partnership, one must value the
interest itself and not the decedent's share of the assets in the entity. *See Church v. United
States*. No. SA-97-CA-0774-OG, 2000 WL 206374 (W.D. Tex. Jan. 18, 2000). This
valuation includes taking into consideration, among other discounts, lack of control and lack
of marketability discounts.

29.     As stated, the fair market value of the assignee interests that passed out of Trust A and Trust
M on Mrs. Williams' death are no more than $68,439,000 each.

30.     "The amounts deductible from a decedents's gross estate as 'administration expenses' ... are
limited to such expenses as are actually and necessarily incurred in the administration of the
decedent's estate; that is, in the collection of assets, payment of debts, and distribution of
property to the persons entitled to it." TREAS. REG. § 20.2053-3(a); *Estate of Graegin v.
Commissioner*, T.C. Memo 1988-477; *Estate of Thompson v. Commissioner*, T.C. Memo.
1988-325. Mrs. Williams' estate lacked sufficient liquid assets to pay its necessary taxes and
obligations without forcing the sale of its illiquid properties. Accordingly, the interest
deduction claimed from the loan is allowable. *Id.*

31.     The Court concludes that Plaintiffs have carried their burden of proof and are entitled to a

refund consistent with the amounts set forth in the above findings of fact.[3]

32.     Interest on the Court's judgment shall run in accordance with the provisions of 28 U.S.C. §
        2411.

### Conclusion

For the reasons set forth above, Plaintiffs' request for a refund is hereby **GRANTED**. Plaintiffs shall, within thirty (30) days of this decision, submit a proposed calculation of the deductions which the Court has found to be permissible, to wit: interest on the loan, attorney's fees, and miscellaneous administrative expenses such as court costs, accountants' fees, and appraisers' fees. The Government shall have fifteen (15) days to object to such amounts. Within thirty (30) days of the determination of said amounts, the Government shall calculate the refund in accordance with the findings and conclusions of the Court and submit said calculation to Plaintiffs. Any dispute thereafter as to the amount of the refund shall be submitted to the Court. A final judgment including the dollar amount of the refund shall then be issued.

It is so **ORDERED**.

Signed this 20th day of August, 2009.

_John D. Rainey_

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

---

[3] The Court notes that Plaintiffs contend that the burden of proof in this case should be shifted to the Government pursuant to 26 U.S.C. § 7491. However, the Court need not reach this issue because, even with the burden placed on the Plaintiffs, Plaintiffs have succeeded as to the issues central to this dispute. Therefore, the Court's ruling on the allocation of the burden in this case would not alter its rulings.